**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| AZTEC OIL & GAS, INC. and | § | Case No. 16-31895 |
| AZTEC ENERGY, LLC, et al., | § | |
| | § | |
| *Debtors.* | § | Jointly Administered |

| | | |
|---|---|---|
| AZTEC OIL & GAS, INC. and | § | |
| AZTEC ENERGY, LLC, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| *vs.* | § | |
| | § | |
| FRANK FISHER, ROBERT SONFIELD | § | |
| L. MYCHAL JEFFERSON, II., | § | Adv. Proc. No. 16-03107 |
| LIVINGSTON GROWTH FUND | § | |
| TRUST, and INTERNATIONAL | § | |
| FLUID DYNAMICS, | § | |
| | § | |
| *Defendants,* | § | |
| | § | |
| *vs.* | § | |
| | § | |
| JEREMY DRIVER, DR. KENNETH | § | |
| LEHRER and MARK VANCE, | § | |
| | § | |
| *Third Party Defendants.* | § | |

**AZTEC OIL & GAS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE ISSUE OF FRANK FISHER'S INDEMNIFICATION**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE AT LEAST 7 DAYS BEFORE THE HEARING DATE. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE**

**PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**THERE WILL BE HEARING ON THIS MOTION ON TUESDAY, NOVEMBER 1, 2016 AT 9:00 AM IN COURTROOM 400, 515 RUSK, HOUSTON, TEXAS 77002.**

TO THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE:

Pursuant to Fed. R. Civ. P. 56, Aztec Oil and Gas, Inc. ("Aztec") moves for partial summary judgment on Frank Fisher's counter-claim for indemnification and on Aztec's own causes of action for breach of fiduciary duty and fraud against Frank Fisher ("Fisher") for using his positions of power within Aztec to embezzle nearly a million dollars and would respectfully show the Court as follows:

## 1. INTRODUCTION

1.1    Aztec is the debtor in the above cause. Fisher is an individual who at all relevant times controlled Aztec through his various positions within Aztec and by his control over shareholder votes. While Aztec provides factual background for purposes of context and discusses multiple causes of action, the primary legal issue to be decided by the Court is: *Is Fisher entitled to indemnification for his knowing violation of the law?*

1.2    During Fisher's last days as CEO and Chairman of the Board, Fisher unilaterally decided that Aztec would pay his legal fees for a criminal action brought against him by the Department of Justice. At the end of the criminal investigation, Fisher pled guilty to felony obstruction of justice and professed under oath that he knowingly lied to prosecutors in connection with a grand jury investigation into illegal stock manipulation.

1.3    Fisher incurred $797,340.40 in legal fees from an independent law firm he hired to represent him in the criminal matter. Fisher, however, was only successful in funneling

$703,388.11 out of Aztec before his scheme was discovered by then president Waylan Johnson.[1] Fisher's counter-claim for indemnification, in part, seeks for Aztec to cover the remainder of Fisher's attorneys fees owed.[2] Doc. 1-14.

1.4     The affidavits of the majority of the Board of Directors (the "Board") and then-president of Aztec are attached and all attest that: 1) they never approved of indemnification of Fisher for his criminal conduct, and 2) they were never informed that Fisher used Aztec's corporate funds to pay his personal attorney's fees until years after the fact.

1.5     Aztec files this motion for summary judgment against Fisher as there is no genuine issue of material fact as to whether or not Fisher was entitled to indemnification for his knowing violation of the law. Once this initial legal issue is decided, Fisher's counter-claim must be dismissed with prejudice and the undisputed evidence leads to the conclusion that Aztec is entitled to partial summary judgment on its causes of action for breach of fiduciary duty and fraud.

---

[1]     Fisher also incurred and charged Aztec $144,836.55 for legal fees from the initial law firm which he hired and directed to represent Aztec, himself, and his companies in responding to subpoenas from the Department of Justice. Discussed further, *infra*. This Motion does not move for a money judgment on this sum of money, but does not foreclose Aztec's right to later prove up the amount Aztec is owed for reimbursement from Fisher if the Court finds he was not entitled to indemnification.

[2]     Fisher also generically seeks "damages resulting from the DOJ investigation." Aztec  is unsure whether or not Fisher also expects Aztec to cover the $390,000 the federal court  forced him to disgorge in connection with the final judgment entered against him.  Prior to the filing of this action, Fisher never demanded repayment of the $390,000 but, as will be discussed, this fact does not stop Fisher from making a meritless claim for same.

## 2.  SUMMARY JUDGMENT EVIDENCE

2.1    In support of this motion, Aztec attaches the following as summary judgment evidence:

| | | |
|---|---|---|
| Exhibit 1 | - | Frank Fisher's Plea Deal and Final Judgment |
| Exhibit 2 | - | International Fluid Dynamic's Consulting Agreement |
| Exhibit 3 | - | Statement of Unanimous Consent of Directors authorizing: Designation and sale of Series A Preferred Stock; Investment Advisory Agreement with SBI USA, LLC; and Consulting Agreement with International Fluid Dynammics, LLC |
| Exhibit 4 | - | Frank Fisher's Demand Letter for Indemnification |
| Exhibit 5 | - | Check # 2046 from Aztec Oil & Gas, Inc. and Invoice # 2326302 from Steptoe & Johnson with Signature of Frank Fisher |
| Exhibit 6 | - | Affidavit of President of Aztec, Jeremy Driver and Spreadsheet of Expenses paid by Aztec for Frank Fisher's attorney's fees |
| Exhibit 7 | - | Affidavit of Kenneth Lehrer, Aztec Oil & Gas Director |
| Exhibit 8 | - | Affidavit of Mark Vance, Aztec Oil & Gas Director |
| Exhibit 9 | - | Affidavit of Waylan Johnson, Former President of Aztec Oil & Gas |
| Exhibit 10 | - | Board Minutes of April 2, 2015 Meeting |
| Exhibit 11 | - | Utah Attorney General's Memorandum in Support of Motion to Dismiss Aztec's Petition to Reinstate the Corporate Charter of Aztec |
| Exhibit 12 | - | Correspondence from Utah Department of Commerce, Division of Corporations Indicating that Aztec's Merger Documents Were Rejected by Utah |
| Exhibit 13 | - | Denials of Reinstatement of Aztec: Dismissal with Prejudice of Aztec's Petition Seeking Reinstatement in June of 2001; and Denial of Appeal of Agency Decision by the Utah Department of Commerce. |
| Exhibit 14 | - | Aztec Communications Group, Inc. Form 8-K, March 31, 2000; Form 10-K, November 22, 2000. |
| Exhibit 15 | - | Aztec Communications Group, Inc. (Nevada) Incorporation Documents |
| Exhibit 16 | - | Aztec (Nevada) Statement of Unanimous Consent of Board of Directors and Sole Shareholder Approving Merger; Plan and |

|              |   | Agreement of Merger; and Articles of Merger |
|--------------|---|---|
| Exhibit 17   | - | Print Out from Edgar of the List of All Documents Filed With the SEC |
| Exhibit 18   | - | Aztec Communications Group, Inc. Form S-8, June 2, 2004 |
| Exhibit 19   | - | Aztec Communications Group, Inc. Form Definitive 14A, December 10, 2003 |
| Exhibit 20   | - | Statement of Unanimous Consent of Board of Directors, January 10, 2004 Regarding Dismissal of Transfer Agent |
| Exhibit 21   | - | Email from Fidelity Transfer Agent to Robert Sonfield Informing Him That the Shareholder List He is Using is Out of Date and Wrong |
| Exhibit 22   | - | Statement of Unanimous Consent of Board of Directors June 11, 2004 |
| Exhibit 23   | - | Letter of Resignation of Board of Directors |
| Exhibit 24   | - | Statement of Unanimous Consent of Directors December 1, 2004 |
| Exhibit 25   | - | Schedule 13D/A, April 8, 2015 |
| Exhibit 26   | - | Schedule 13D/A, April 18, 2014 and December 16, 2011 |
| Exhibit 27   | - | Livingston Growth Fund Trust Documents |
| Exhibit 28   | - | Bill of Sale from Pragmatica Partners to Sage Capital Zurich AG; Conveyance from SBI USA, LLC to Alpen Finanz, Ltd. |
| Exhibit 29   | - | Statement of Unanimous Consent of Board of Directors June 15, 2007 |
| Exhibit 30   | - | Meeting of Board of Directors January 28, 2010 |
| Exhibit 31   | - | Department of Justice Subpoenas |
| Exhibit 32   | - | Schedule 13D, November 21, 2007 |
| Exhibit 33   | - | Business Records Affidavit from Aztec's President, Jeremy Driver |

## 3.  SUMMARY OF THE ARGUMENT

3.1     Fisher was investigated by the SEC and Department of Justice for insider trading and his involvement in a stock manipulation scheme. Nearly identical subpoenas were originally sent to Fisher, Fisher's companies International Fluid Dynamics ("IFD") and CSI Energy, LP, and Aztec. Fisher hired one firm to represent all of the individuals and entities responding to the subpoenas. After a period of time however, it became clear that the Department of Justice was increasingly focusing in on Fisher for his own personal conduct. Fisher was then told by Aztec's counsel to seek out his own independent counsel to represent him in the impending criminal charges against him individually. Fisher then, independent from Aztec and Aztec's own counsel, incurred $797,340.40 in attorney's fees from this second law firm.

3.2     At the end of the investigation, Fisher pled guilty to a felony charge of obstruction of justice for knowingly lying to prosecutors in connection with a grand jury investigation into a stock manipulation scheme. Fisher professed under oath that he knowingly violated securities laws, knew that his statements to the prosecutors were lies, and that he intended for the prosecutors to rely upon his false statements. Despite this, Fisher directed Aztec's outside accountant to pay for the second set of attorney's fees out of Aztec's corporate funds based on the indemnification clause in a Consulting Agreement between Aztec and Fisher's company—IFD.

3.3     Fisher is not entitled to indemnification as a matter of law because his conduct was outside the scope of the Consulting Agreement, the indemnification provision cannot satisfy the express negligence rule, and Aztec cannot permissively indemnify Fisher's knowing violation of the law.

3.4     Interpretation of a contract is a question of law. *McLane Foodservice, Inc. v. Table*

*Rock Restaurants, L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013). As such, "[w]hether a contractual indemnity provision complies with the express negligence doctrine is a question of law for the court." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). Moreover, when the facts are not in dispute, the applicability of Nevada's permissive indemnification statute is to be decided by a court. *Bedore v. Familian*, 125 P.3d 1168, 1173–74 (Nev. 2006).

3.5    First, the indemnification provision is only triggered if the harm arises out of the Consulting Agreement or the conduct of Aztec. Because the Consulting Agreement specifically excludes any services for the promotion of stock—the sole reason the SEC was investigating Fisher and others—and because Aztec made no decision in connection with Fisher's decision to participate in the stock manipulation scheme or to lie to authorities, the indemnification provision was never triggered.

3.6    Second, the indemnification provision does not indemnify Fisher for his own intentional/criminal misconduct because it cannot satisfy the express negligence rule. The express negligence rule requires that an indemnification provision clearly and specifically state the indemnitor's intent to indemnify the indemnitee for the indemnitee's own negligence and/or intentional misconduct. The express negligence rule does not allow indemnification *for the indemnitee's own negligence* to be implied from overly broad provisions. The only applicable indemnification provision here states simply that Aztec will indemnify Fisher from "any action by third parties." Such a provision is too broad and vague to satisfy the express negligence rule, let alone evidence an intent to indemnify Fisher for his own intentional and criminal misconduct pursued for the purpose of enriching himself.

3.7    Third, permissive indemnification by Aztec would not be allowed under Nevada law

because: 1) it was never approved by the Board or shareholders, and 2) Fisher's knowing violation of the law is not legally allowed to be covered.

3.8     Further, Fisher's conduct in secretly and unilaterally taking $703,388.11 of the corporate funds of Aztec to pay for his own personal expenses amounted to fraud by misrepresentation and/or non-disclosure and was a breach of the fiduciary duties Fisher owed to Aztec.

3.9     Fisher, an attorney at the time, knew or should have known that there was a strong possibility he would not be indemnified for his intentional and criminal misconduct. Despite this, Fisher recklessly made positive assertions to the outside accountant that the fees were due and owing. Fisher did so by sending invoices to Aztec's outside accountant, directing the accountant to pay for Fisher's legal bills. The accountant wrote the checks to Fisher's independent legal counsel without knowledge that the invoices were not in fact due and owing by Aztec as represented. Fisher then either signed the checks himself or directed his assistant Ariane Cox to sign them.

3.10    Fisher hid from the Board that he was using Aztec's corporate funds to pay his own attorney's fees even though he was not entitled to indemnification. Further, Fisher directly lied to board member Dr. Kenneth Lehrer when he told him that he was paying his own attorney's fees. Fisher's use of Aztec's corporate funds to pay for his attorney's fees was not discovered by the Board until years later, at which time this lawsuit was authorized to recover Aztec's funds.

## 4. RELEVANT FACTUAL BACKGROUND

4.1     This Motion for Summary Judgment lays out a substantial amount of facts in order to provide the Court with background knowledge of the case and to explain the full extent of Fisher's fraud. However, the only facts which are truly necessary to decide whether or not

Fisher is entitled to indemnification are the consulting agreement (which lays out the scope) and the plea agreement (which lays out Fisher's conduct). These two pieces of evidence are authenticated and indisputable, making the present issue of indemnification ripe for a judgment as a matter of law—no matter how the Court views the rest of the recited facts.

### A.    The creation of the corporation and the alleged merger.

4.2    This is a case of corporate hijacking by Defendants Mychal Jefferson ("Jefferson"), Fisher and Robert Sonfield ("Sonfield") perpetrated through their individual actions and through the use of Fisher's company IFD, and his revocable trust, the Livingston Growth Fund Trust ("Livingston Trust"). The facts show that Defendants Jefferson, Fisher and Sonfield usurped the identity of the defunct corporation, Aztec Communications Group, Inc. (Utah) and subsequently implemented a void merger between it and a new company, Aztec Communications Group, Inc. (Nevada), so that the resulting company could be publically traded and so that Fisher could hold shares secretly while manipulating Aztec and its stock behind the scenes.

4.3    Aztec (Utah) was formed as Asterisk, Inc. in 1986 (later changing its name to Aztec Communications Group, Inc.) and was a publically traded corporation which continued its existence for the sole purpose of being a shell for other companies which wished to go public. Exhibit 11, p. 4 – 5. From at least 1990 until the merger in 2004, Aztec never held any assets or conducted any business. Exhibits 11, p. 4 – 5; and 14, p. 6. In April of 1994, Aztec Communications Group, Inc.'s charter in Utah was suspended for failure to pay taxes. Exhibit 13, p. 1. In April of 1996, the period of time allowed to attempt to reinstate the corporation was closed. Exhibit 11, p. 5.

4.4    In March of 2000, the president of defunct Aztec (Utah), Andrew Palmquist, met

with Defendant Mychal Jefferson—a stock promoter—and purported to name Mychal Jefferson as CEO, Chairman, and President of Aztec (Utah) and named Jefferson's wife as the other board member. *See* Exhibits 14, p.  2, 11, & 21; and 11, p. 5. Jefferson then held supposed shareholder meetings for Aztec (Utah) asking for approval to move the corporate headquarters, to begin attempting to reinstate Aztec (Utah), and to start filing documents with the SEC to allow Aztec (Utah) to return to being a reporting company which could trade on a national exchange. Exhibit 11, p. 4 – 5.

4.5     Defendants were told four times by the state of Utah that reinstatement could not happen for this company.[3] Since Defendants were told by Utah they could not revive the corporation, all of these acts were supposedly done in furtherance of "winding up" of the business.[4]

4.6     In November of 2003, Aztec (Nevada) was formed having the same name as the Aztec (Utah)—Aztec Communications Group, Inc. Exhibit 15. In January of 2004, the two

---

[3]     These denials include: the November 2000 denial by the Utah Division of Corporations for Aztec's application for reinstatement; the January 2001 denial of reinstatement by the Director of the Department of Commerce in Utah; the dismissal with prejudice of Aztec's petition seeking reinstatement in June of 2001 by District Court in Salt Lake City, Utah; and denial of appeal of agency decision by the Utah Department of Commerce in August of 2003. Exhibit 13, p. 17 – 18.

[4]     Defendants attempt to shrug off the invalidity of the merger in Third Party Plaintiffs' Response to Third Party Defendants' Motion to Dismiss by saying that although the corporation was in fact dissolved for over ten years, that the merger of the companies was still allowed because dissolved corporations still exist for the purpose of winding up their affairs and the merger was pursuant to this purpose. *See* Doc. 17, p. 3, n. 3. However, Sonfield and Fisher knew the merger was invalid because they had been informed four times by the state of Utah that Aztec (Utah) could not be reinstated (*Supra* n. 3), and because when the companies subsequently attempted to merge, the state of Utah rejected the merger documents and informed the incorporators that a merger could not legally be allowed with a company which was "expired." Exhibit 12.

As the Attorney General of Utah told Jefferson and Sonfield, in March of 2001: "the actions taken in March and April 2000 purportedly to appoint new officers, to revive the corporation, to grant new stock options, ***and to hire the new president of Aztec to sell the company to some future, undisclosed company are without any legal basis***. As of April 6, 1996 when the reinstatement window was closed, there has been no authority for anyone to take any action on behalf the now-dissolved Aztec." Exhibit 11, p. 11 (emphasis added). Surely, the variety of actions taken by Jefferson and Sonfield over the four years from 2000 through 2004 (when the merger was finally purportedly consummated)—such as appointing an entirely new board and creating a new subsidiary—were not in furtherance of any winding up of the corporation.

companies were purportedly merged. Exhibit 16, p. 7 – 9. After the purported merger, new stock was issued by the surviving corporation on a one-to-one ratio dependant on the number of shares held in Aztec (Utah). Exhibit 16, p. 8, ¶5. New shares were additionally issued to employees, board members, consultants, and Sonfield as compensation. *Discussed infra*.

4.7     A registration statement (Form S-8) was filed to register the new securities issued to employees as stock compensation, but it was filed with the SEC under the file name of Aztec (Utah) and with the financial records of Aztec (Utah). *See* Exhibits 17 and 18. However, no new registration statement was ever filed for the new shares issued to replace the previously publicly traded Aztec (Utah) shares but instead, these shares just began to trade publically.[5] *See generally* Exhibit 17.

4.8     The merger was reported to the SEC as a "reincorporation" of Aztec into Nevada,[6] and Aztec (Nevada) was purported to be the wholly-owned subsidiary[7] of Aztec (Utah). Exhibit 19, p. 2 – 8. No SEC filing ever informed the SEC or the public that the state of Utah had told the Defendants that Azec (Utah) no longer existed, that their actions in creating

---

[5]     It is not clear what legal basis Sonfield and Jefferson will claim provided them the right to begin trading shares in a new corporation publically without going through any of the required SEC procedures for an IPO or without even filing a registration statement. There was not a reverse merger, as Aztec (Nevada) purportedly survived and Aztec (Utah) was terminated. Further, there does not seem to be any basis for the new securities issued by Aztec (Nevada) to trade under the banner of Aztec (Utah)'s registration as a "successor." *See* 17 C.F.R. 12g-3 (Registration of securities of successor issuers under section 12(b) or 12(g)); *see also* 2000 SEC No-Act. LEXIS 1072, *2 ("the definition of 'succession' requires 'the direct acquisition of the assets comprising a going business' ") (emphasis in original). This is especially so in light of the fact that the merger was ineffective.

[6]     Interestingly, even though the merger request had been denied by Utah, the merger was purported to be done pursuant to Utah law. Exhibit 19, p. 4 ("The reincorporation will be conducted as a merger of Aztec Utah into our wholly owned subsidiary pursuant to the Utah Code.").

[7]     No appraisal or buy-back of shares was permitted during the merger specifically because this was a merger into a wholly owned subsidiary. Exhibit 19, p. 5. However, because Aztec (Utah) had no authority to buy shares of Aztec (Nevada) as part of the process of winding up, this was simply another fraud perpetrated on the shareholders of Aztec (Utah).

---

the new board were illegitimate, and that all actions of the new Aztec (Utah) board subsequently were invalid. No SEC document ever informed the public that Utah had rejected the companies merger documents.

4.9     Concurrent with the merger, the Board dismissed Aztec (Utah)'s previous transfer agent, hired a new transfer agent, and Sonfield gave the new transfer agent a shareholder list to work with which he knew was inaccurate. *See* Exhibits 20; and 21, p. 1 (Emails from Fidelity transfer agent to Sonfield: "The shareholder list we provided prior was not complete! I can't believe you are using it.").[8]

4.10    In June of 2004, Aztec held a shareholder meeting and changed its name from Aztec Communications Group, Inc. to Aztec Oil & Gas, Inc. This would be the last shareholder meeting that Aztec would ever hold. *See* Doc. 1-3 (Fisher and Livingston Trust's petition for a shareholder meeting), Adversary: 16-03125.

4.11    Also, in June of 2004, Aztec authorized the following actions:

    a.      The creation of the Series A preferred shares which would have a non-dilutable 70% voting right in Aztec;

    b.      The transfer of one-half of those shares to Fisher's company Pragmatica Partners and one-half to SBI USA, LLC ("SBI");

    c.      Entering into an investment advisory agreement with SBI; and

    d.      Entering into a consulting agreement with Fisher's company IFD.

Exhibit 22, p. 1 – 8.

---

[8]     This is not the first time that Sonfield has used a merger to issue shares into the public illegally or used fraudulent shareholder lists and/or certificates to give his clients newly created public shares without going through the proper process. *See SEC v. Sonfield*, et. al, 4:08-cv-02351 (S.D. Tex.) (Doc. 1 – Complaint) & (Doc. 180 — Final Judgment). The SEC news release is *available at*: https://www.sec.gov/litigation/litreleases/2008/lr20665.htm ("[Sonfield and others] violated various provisions of the federal securities laws in their unregistered, nonexempt distribution of more than 10.8 million shares of the common stock... The complaint further alleges that Sonfield caused the shell to issue several unpaid, backdated stock certificates, in order to make false claims that the shares qualified for sale under certain exemptions to the registration provisions of the federal securities laws.").

4.12     In August of 2004, all officers and board members of Aztec resigned and purportedly granted Sonfield the power to act as power of attorney on their part. Exhibit 23. This was a clear violation of Nevada law. *See* Nev. Rev. Stat. Ann. § 78.115 (Requiring a corporation to maintain at least one director); *see also Geller v. Tabas*, 462 A.2d 1078, 1083 (Del. 1983) ("[it is a] well settled rule that the Board of Directors manage the corporation, and they cannot abdicate these responsibilities."). Sonfield then began running the corporate governance of Aztec single-handedly, signing resolutions and issuing himself stock in the name of the absent board members. *See e.g.* Exhibit 3, p. 8; and 24. The first new board member was elected in August of 2005 which was Dr. Kenneth Lehrer ("Director Lehrer").

### B.     Fisher's alter-ego role in the corporation.

4.13     Fisher has been involved in the high-jacking of the defunct Aztec (Utah) corporation from the beginning and directed Jefferson's actions in attempting to revive the corporation to be used as a shell. *See* Exhibit 7 (Affidavit of Director Lehrer), ¶ 5. Fisher has admitted to buying shares in defunct Aztec (Utah) as early as 2002. Exhibit 1, p. 16, ¶ 3. These shares would have been bought after the state of Utah already told Defendants three times that the corporation could not be reinstated and that the actions of its supposed new Board were invalid. *See supra* n. 3 & 4.

4.14     Fisher—an attorney at the time—knew or should have known that the actions of Jefferson and Sonfield were illegal and invalid but still deeply involved himself in the scheme to create a public company out of thin air for the purpose of enriching himself. Fisher was able to enrich himself by buying the defunct Aztec (Utah) corporation's shares and exchanging them for shares in Aztec (Nevada).

4.15     Fisher then entrenched his power, by using his control over the corporation and Mychal Jefferson to have the corporation issue 100,000 Series A Preferred Shares which

entitled their holder to a non-dilutable 70% voting right.

4.16    In June of 2004, the 100,000 preferred shares were created with 50,000 going to SBI USA, LLC (later convicted of manipulating Aztec's stock, discussed *infra*) and 50,000 going to Pragmatica Partners, LLC.[9] Exhibit 3, p. 2 – 4. SBI subsequently sold its shares for $100 to Alpen Finanz, Ltd. in Zurich, Switzerland and Pragmatica sold its shares for $100 to Sage Capital Zurich AG, also located in Zurich, Switzerland. Exhibit 28.

4.17    On April 8, 2015—six days after the present lawsuit was filed against Fisher—Sonfield filed *for the first time* a statement of beneficial ownership of all 100,000 Series A shares on behalf of Livingston Trust. Exhibit 25, p. 2 – 4. According to the filing, the shares were transferred to the Livingston Trust on June 7, 2012 but no information is given as to whom the shares were purchased from or for what consideration.[10] Exhibit 25. Livingston Trust is a revocable trust created by Fisher, the beneficiary of the trust is Fisher's wife, and Sonfield is the trustee. Exhibit 27, p. 5 – 8.

4.18    Further, in November of 2007, Fisher reported holding 18,892,725 common shares or 52.11% of the common stock. Exhibit 32, p. 4. Fisher continued to hold such shares until he transferred 10,811,570 (29.3% of the common shares) to the Livingston Trust in November of 2010 who has held the common shares until presently. Exhibit 26, p. 6 – 10.

4.19    In addition to purported control over the shares, Fisher also maintained control of the corporation through the various positions he held. Fisher was the CEO and Chairman of the Board of Aztec from June 15, 2007 through February 1, 2010. Exhibit 29. From

---

[9]     Pragmatica Partners was represented by Frank Fisher as attorney in fact and listed its address as: The Law Offices of Franklin C. Fisher. Exhibit 3, p. 18 – 19.

[10]     Sonfield also filed Form 13D's on April 18, 2014 and December 16, 2011 on behalf of Livingston Trust showing that the trust owned 10.8 million common shares but made no mention of the Series A preferred in these filings. Exhibit 26.

February 1, 2010 through 2015, Fisher was an agent of the corporation via his independent

consulting agreement therewith. Exhibit 30, p. 1 – 3. From June of 2004 through 2015,

Fisher was also a consultant via Aztec's Consulting Agreement with IFD. As Fisher switched

from position to position, his control over Aztec and his role within it stayed the same. *See*

Exhibits 7 (Director Lehrer), ¶ 7; 8 (Director Vance), ¶ 4; and 9 (Former president Waylan

Johnson), ¶ 11.

4.20    Fisher has used his control over Aztec to make the company into his own piggy-bank

and as the source of funding for his personal oil & gas ventures. Fisher regularly issued

himself royalty interests in wells and/or took better wells for himself and his own

companies while out on Aztec business.

### C.    Fisher's participation in the stock manipulation scheme.

4.21    According to Fisher's plea agreement, the following took place after the entire initial

Board resigned and Sonfield took over Aztec:

> On or about March 30, 2004, at SBI USA's request, Fisher introduced
> Tolonen [a stock promoter] to Singhal [President of SBI] and Businessperson
> B-2 for the purpose of promoting stocks by preparing newsletters
> recommending the purchase of a particular company's shares.

> From in or about September 2004 through in or about May 2005, Singhal
> and Businessperson B-2 caused newsletters containing false and misleading
> disclaimers, purportedly paid for by "a non-affiliated third party," Bedford
> Propriety Trading, LLC ("Bedford Propriety Trading"), recommending the
> purchase of Aztec shares, to be mailed to potential investors. Bedford
> Proprietary Trading was a conduit used to receive cash payments directly and
> indirectly from Singhal, Fisher and others to pay for these newsletters
> recommending the purchase of Aztec shares. Fisher and Singhal, after the
> newsletters were disseminated to the investing public, each caused shares of
> Aztec to be sold to the investing public.

> Fisher knew from his discussions with Singhal that the Aztec newsletters for

which Fisher had partially paid had not complied with applicable securities regulations.

Exhibit 1, p. 3 – 4, ¶¶ 12 – 13. From the time period of January 1, 2004 to June 30, 2005, Fisher profited off of the sale of Aztec stock in an amount in excess of $4 million.

4.22   Aztec went from being non-existent when Fisher first started buying shares in 2001 – 02, to $0.40 a share in September of 2004 (when the newsletters started), to a high of $2.85 a share in October of 2004.[11]

### D.   The criminal investigation of Fisher.

4.23   In March of 2008, the SEC and the Department of Justice began an investigation into SBI and Fisher, among others. The firm of Porter Hedges was hired[12] to represent Aztec, Fisher, and Fisher's various companies in responding to nearly identical subpoenas sent from the justice department. Exhibit 31, p. 32 – 36.

4.24   After about a year and half, it became clear that the target of the investigation was not Aztec but instead Fisher individually, and Fisher was told to seek out his own counsel by Aztec's counsel.

4.25   Around October of 2009, Fisher engaged the firm of Steptoe & Johnson in Washington, D.C. and over the next two years racked up a bill of $797,340.40. Exhibit 6, p. 7. Aztec was in no way involved with the firm of Steptoe & Johnson. Exhibits 7 (Director Lehrer), ¶¶ 9, 15 – 18; 8 (Director Vance), ¶¶ 6 – 9; and 9 (Waylan Johnson), ¶¶ 7 – 10.

---

[11]    *See* Google Finance: Aztec Oil & Gas, Inc., *available at*: https://www.google.com/finance?q=OTCMKTS:AZGSQ

[12]    Fisher directed Aztec to hire Porter Hedges to represent Aztec along with himself and two of his companies IFD and CSI Energy. Although Porter Hedges purportedly did some work for Aztec by responding to the subpoena on behalf of them, the Board was kept in the dark about the fact that a subpoena was sent to Aztec and that Porter Hedges had been hired. Exhibits 7 (Director Lehrer), ¶¶ 15 – 18; and 8, ¶¶ 6 – 9. In fact, the only person from Aztec who signed the engagement letter from Porter Hedges was Kathryn Parks, the VP of Aztec who was also Sonfield's legal assistant at his law firm. Exhibit 31, p. 29.

Aztec did not hire the firm, did not talk to the firm, and unlike Porter Hedges, Steptoe & Johnson never even purported to perform any legal services for Aztec. Exhibits 7 (Director Lehrer), ¶¶ 9, 15 – 18; 8 (Director Vance), ¶¶ 6 – 9; and 9 (Waylan Johnson), ¶¶ 7 – 10.[13]

4.26   The end result of the criminal investigation was a plea bargain taken by Fisher in December of 2010, where he pleaded guilty to a felony charge of obstruction of justice for lying to prosecutors in connection with the stock manipulation investigation and agreed to disgorgement in the amount of $390,000. Exhibit 1, p. 1, 5, & 17 – 18. In connection with the plea, Fisher professed under oath that he:

> corruptly endeavored to influence, obstruct, and impede the due administration of justice by providing false and misleading statements to agents from the Federal Bureau of Investigation and prosecutors... knowing that the false and misleading statements were made in connection with an on-going grand jury investigation... and intending the false and misleading statements to be conveyed to the grand jury.

> I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

Exhibit 1, p. 4 – 5, ¶¶ 14 – 15.

4.27   Before he could be disbarred, Fisher "voluntarily" forfeited his law license—most likely upon the realization that he would have to report a felony charge of obstruction of justice to the state bar. *See* Tex. Disciplinary R. Prof'l Conduct 8.03 (Reporting requirements); *see also* 8.04(a)(2) ("A lawyer shall not commit a serious crime or commit any other criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects"); *see also* 8.04(a)(4) ("A lawyer shall not engage in

---

[13]   Fisher in his Third Party Plaintiffs' Response to Third Party Defendants' Motion to Dismiss attempts to mislead the Court by pretending that there was only one set of attorney's fees: "the attorney's fees... were properly paid by Aztec to attorneys engaged by Aztec to represent Aztec and its key personnel..." Fisher knows that there were two sets of attorney's fees and that Steptoe & Johnson had nothing to do with Aztec.

conduct constituting obstruction of justice").

### E.    The embezzlement of corporate funds by Fisher.

4.28    In November of 2008—8 months after the initial subpoena was served upon Aztec, Fisher, and Fisher's companies—Waylan Johnson was hired as consulting president of Aztec.[14] Exhibit 9 (Waylan Johnson), ¶ 3. Waylan Johnson was told by Fisher that his role was limited to oil and gas matters and raising funds for Aztec's drilling partnerships. Exhibit 9, ¶¶ 3 – 5. Waylan Johnson was told by CEO Fisher, that Fisher's role in the corporation consisted of overseeing the day-to-day operations of Aztec, public company compliance, corporate governance, administration of personnel and management, and the finances of Aztec. Exhibit 9, ¶¶ 3 – 5. Waylan Johnson was never informed of the subpoena sent to Aztec. Exhibit 9, ¶¶ 7 – 8.

4.29    Fisher ran all of Aztec's internal affairs and finances from Aztec's Houston office. Exhibit 9, ¶¶ 5 – 6, 11 – 12. There were only two employees at the Houston office, Fisher and Ariane Cox ("Cox")—Fisher's assistant who at the time held the position of Executive Vice-President. Exhibit 9, ¶¶ 5 – 6, 11 – 12. The Houston office was independent of Waylan Johnson, who took care of all of his business for Aztec at his personal offices in Austin where he lived. Exhibit 9, ¶¶ 5 – 6, 11 – 12. Further, the Houston office was ran by Fisher with little oversight from the Board. Exhibit 9, ¶¶ 5 – 6, 11 – 12.

4.30    On November 30, 2009—while Fisher was CEO—Fisher received the first bill from his independent counsel Steptoe & Johnson. Fisher wrote on the invoice: "pay under indemnification clause in IFD consulting contract w/ Aztec" and then signed his initials.

---

[14]    As outlined in his affidavit, Waylan Johnson was told the position he was being offered was that of "consulting president," a non-employee, independent contractor position which held a limited role within Aztec. Exhibit 9, ¶¶ 3 – 4. This motion will simply refer to Waylan Johnson as the president of Aztec.

Exhibit 5, p. 2. Fisher then sent the invoice from the Houston office to the outside accountant that Aztec used to pay Aztec's bills. Exhibit 9, ¶¶ 13 − 17. The accountant—unaware of the circumstances—cut check # 2046 in the amount of $124,456.75 to pay the invoice. Exhibit 6, p. 7. The check was paid out to Steptoe & Johnson on January 15, 2010. Exhibit 6, p. 7.

4.31    On January 25, 2010 (ten days after the first $125,000 was paid to Steptoe & Johnson), Fisher supposedly[15] made his first demand for indemnification upon Aztec by sending a letter to Waylan Johnson for indemnification under the Consulting Agreement between Aztec and IFD. Exhibits 4; and 9 (Waylan Johnson), ¶ 17. This demand was never presented to the Board however and in fact, was never seen by them. Exhibits 7 (Director Lehrer), ¶¶ 15 − 16; and 8 (Director Vance), ¶¶ 6 − 7.[16]

4.32    As part of the Board Resolution dated January 28, 2010, Fisher resigned as CEO and Chairman of the Board in February of 2010. Exhibit 30, p. 1 − 2. Fisher was immediately given a consulting position with Aztec which would report directly to the Board and not to Waylan Johnson. Exhibits 30, p. 1 − 2; and 9, ¶ 11. The change in title was done at the request of Fisher and was in direct response to the ongoing criminal investigation. Exhibits 7 (Director Lehrer), ¶ 7; and 8 (Director Vance), ¶ 3. Additionally, at the request of Fisher, Cox was appointed to the positions of Vice President, Secretary, and Treasurer of Aztec. Exhibits 9 (Waylan Johnson), ¶ 11; and 30, p. 1 − 2.

---

[15]    Although the letter is dated January 25, 2010, the first time that Waylan Johnson can actually recall ever seeing the Demand Letter from Fisher was in mid-2013, shortly after Waylan Johnson discovered for the first time the payment of the $703,388.11 to Steptoe & Johnson and began questioning the legality of such payments. Exhibit 9, ¶ 17. Even assuming the demand letter was served on Waylan Johnson on January 25, 2010, it makes no difference as to the result of this Motion for Summary Judgment because Johnson had no authority to approve such an expenditure and took no action upon the request.

[16]    Throughout the time of the embezzlement the Board was made up of three members with Director Lehrer and Vance making up a majority of the Board. The third Board member was Fisher until he resigned and his step-son Dayton Wheeler took his spot.

4.33    Despite Cox and Fisher's changing their roles, the Houston office was ran in the same manner as before Fisher's resignation—Fisher maintained all of the same duties and permissions and continued to run Aztec while Cox continued to act as Fisher's assistant doing what he told her to do. *See* Exhibit 7 (Director Lehrer), ¶ 7; 8 (Director Vance), ¶ 4; and 9 (Waylan Johnson), ¶¶ 11 – 12.

4.34    From January of 2010 to February of 2013, Fisher had Aztec pay $703,388.11 in legal fees to Steptoe and Johnson without permission of the Board. Exhibit 6, p. 6 – 7. Fisher would do this by unilaterally authorizing payment of invoices and then subsequently sending them to Aztec's outside accountant which then billed Aztec and wrote checks for payment to Steptoe & Johnson. Exhibit 9 (Waylan Johnson), ¶¶ 13 – 16. Fisher would then either sign the checks himself or direct Cox to sign the checks depending on the date and check. Exhibit 9 (Waylan Johnson), ¶¶ 13 – 16.

4.35    In early 2013, while Waylan Johnson was investigating another matter at Aztec, he discovered from Cox that Fisher had used Aztec's corporate funds to pay all of his legal bills. Exhibit 9, ¶¶ 13 – 16. Waylan Johnson then contacted Aztec's outside accountant and confirmed that it was in fact Fisher who authorized the payment of over $700,000 in attorney's fees to the firm of Steptoe & Johnson. Exhibit 9, ¶¶ 13 – 16. On May 23, 2013, Waylan Johnson sent an email to outside counsel asking him to look into the legality of the matter and learned that it would be highly suspect that any agreement would cover Fisher's criminal acts. Exhibit 9, ¶¶ 13 – 16. Waylan Johnson confronted Fisher with the information he had found and in response, was shown the Demand Letter dated January 25, 2010 as justification for the payment. Exhibit 9, ¶ 17.

4.36    Around the same time period (March/April 2013), Fisher went to the business offices of Director Lehrer. Exhibit 7 (Director Lehrer), ¶¶ 10 – 11. During this visit, Fisher told

Director Lehrer that he was forced to plead guilty to a felony because Singhal had "entrapped" him, and that he was personally paying out all of his own legal fees which had caused him significant financial stress. Exhibit 7, ¶¶ 10 − 11. Fisher told Director Lehrer this in order that Director Lehrer would feel sorry for Fisher and write a recommendation letter to the judge for Fisher's upcoming sentencing hearing. Exhibit 7, ¶¶ 10 − 14. At the time Fisher told Director Lehrer this, he had already directed Aztec to pay the $703,388.11 to Steptoe & Johnson. Exhibit 6, p. 6 − 7.

4.37    On June 10, 2013, Waylan Johnson was terminated as president at the request of Fisher. Exhibit 9 ¶¶ 18 − 9. At the June 2013 meeting where Waylan Johnson was terminated, he was given an opportunity to speak to the Board about missing corporate funds. Exhibits 7 (Director Lehrer), ¶¶ 14 − 15; 8 (Director Vance), ¶ 5; and 9 (Waylan Johnson), ¶¶ 18 − 19. Waylan Johnson then informed the Board for the first time that Fisher had used Aztec's corporate funds to pay his own legal expenses. Exhibits 7 (Director Lehrer), ¶¶ 14 − 15; 8 (Director Vance), ¶ 5; and 9 (Waylan Johnson), ¶¶ 18 − 19.

4.38    The Board never approved the $703,388.11 Fisher took to pay his legal fees owed to Steptoe & Johnson. Exhibits 7 (Director Lehrer), ¶¶ 15 − 18; and 8 (Director Vance), ¶¶ 6 − 9. Instead, upon learning of the payment, the Board authorized the present lawsuit against Fisher to collect such funds. Exhibit 10, p. 4 − 5.

## 5. SUMMARY JUDGMENT STANDARD

5.1    A summary judgment "is appropriate if the moving party shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Crose v. Humana Ins. Co.*, 823 F.3d 344, 347 (5th Cir. 2016). A genuine issue of material fact exists "when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. The facts must be viewed in the "light most favorable to the

non-moving party." *Id.*

5.2    A plaintiff is entitled to summary judgment on his affirmative claims if he can show that there is no genuine issue of material fact as to every element of his claim. *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 585 (5th Cir. 2004). A plaintiff is entitled to summary judgment on a defendant's counter-claim if the defendant cannot raise a genuine issue of material fact as to an essential element of its counter-claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## 6. ARGUMENTS AND AUTHORITIES

6.1    As stated, the primary legal issue to be decided by this Court—for the purposes of this motion—is whether or not Fisher was entitled to indemnification for his knowing violation of the law.

6.2    This motion will first analyze why Fisher was not entitled to indemnification as a matter of law and then will subsequently explain how that ruling—along with all of the other evidence—leads to the conclusion that Aztec is entitled to partial summary judgment on its causes of action for breach of fiduciary duty and fraud.

### A.    *The attorney's fees are unauthorized because Aztec never agreed to indemnify Fisher for intentional and criminal misconduct taken outside of the Consulting Agreement*.

6.3    The Consulting Agreement provides that it is governed by the laws of Texas, "provided, however, that if any provision of this Agreement is unenforceable under such law but is enforceable under the laws of the State of Domicile of the Company" then Nevada law will apply. Exhibit 2, ¶ 6.3. Therefore, the Consulting Agreement must be looked at under both Texas and Nevada law.

6.4    Both Texas and Nevada follow the "express negligence" doctrine in determining whether or not a party is entitled to indemnification for their own intentional/negligent

conduct. *See Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 707-08 (Tex. 1987); *see also George L. Brown Ins. v. Star Ins. Co.*, 237 P.3d 92, 97 ( Nev. 2010). The express negligence rule applies even if both parties contributed to the harm, so long as a wrong-doer is asking for indemnification for his own tortious/wrongful conduct. *Reyburn Lawn & Landscape Designers, Inc. v. Plaster Dev. Co., Inc.*, 255 P.3d 268, 275 (Nev. 2011).

6.5     Fisher has no right to indemnification under the IFD Consulting Agreement for his own intentional misconduct which was taken in furtherance of his own personal gains and independent of any actions or approval of Aztec.

> *i.     The indemnification provision does not cover Fisher's personal conduct taken outside of the Consulting Agreement.*

6.6     Fisher's conduct was done for personal gain, and not in his role as a consultant. The Consulting Agreement's scope is limited by various provisions, such as:

> *1.5     No Capital Raising Services.* The Services do **NOT** include consulting with or advising or assisting the Company, **in any manner** (i) in connection with the offer or sale of securities in any capital-raising transaction, or (ii) to directly or indirectly promote or maintain a market for any of the Company's securities.
>
> *1.6     No Investment Advisory or Brokerage Services; No Legal Services.* The services do **not** include requiring the Consultant to engage in any activities for which an investment advisor's registration or license is required… Consultant's work on this engagement shall **not** consist of effecting transactions in the Company's Securities regarding capital raising transactions, etc. or the promotion or maintenance of a market for the Company's Securities… or the promotion or maintenance of a market for the Company's Securities…

Exhibit 2, ¶¶ 1.5 – 1.6 (emphasis in original).

6.7     All of the conduct that Fisher was investigated for was in relationship to a stock promotion scheme which was outside the scope of the Consulting Agreement and which was for the purpose of personal enrichment. *See generally* Exhibit 1, p. 16 – 20. Fisher and SBI

invested their own money into the newsletters, for conduct outside the scope of their consulting agreements[17] and which was never approved by Aztec, and they personally benefitted by selling their own shares. Exhibit 1, p. 17 – 18.

6.8     Further, nearly all of the provisions of the indemnification clause specifically require Aztec's own negligence to be triggered or are strictly limited to the scope of the consultant's work:

> *6.11 Indemnity by the Company.* The Company shall protect, defend, indemnify and hold Consultant and its assigns and attorneys, accountants, agents, consultants, employees, officer and directors harmless from and against all losses, liabilities, damages, judgments, claims, counterclaims, demands, actions, proceedings, costs and expenses (including reasonable attorney's fees) of every kind and character resulting from, relating to or arising out of (a) the suggestions and advice provided by Consultant <u>pursuant to this Agreement</u>, (b) the inaccuracy, non-fulfillment or breach of any representation warranty, covenant or agreement <u>made by the Company</u>; or (c) any legal action, including any counterclaim, representation, warranty, covenant or agreement <u>made by the Company</u> or any third-party; (d) negligent or willful misconduct, occurring during the term hereof, or thereafter, <u>with respect to any decision made by the Company</u>; or (e) any action by third parties.

Exhibit 2 (emphasis added).

6.9     Subsections (a), (b), (c), and (d) do not apply on their face because 1) Aztec was not involved at all in the decision to promote its stock—a service which was clearly excluded from the consulting agreements of both IFD and SBI; and 2) Aztec was not involved in Fisher's personal decision to lie to prosecutors and the SEC. Because these subsections specifically condition indemnification on actions by Aztec or in furtherance of the Consulting Agreement, they cannot be used to cover Fisher's completely personal matters.

---

[17]     SBI had a nearly verbatim provision in its consulting agreement stating that any stock promotion was outside the scope of the agreement.

*See Reyburn Lawn & Landscape Designers, Inc. v. Plaster Dev. Co., Inc.*, 255 P.3d 268, 275 (Nev. 2011) ("According to the indemnity clause at issue here, Plaster must be indemnified for 'any and all' liabilities that 'aris[e] directly or indirectly out of' Reyburn's obligations under the subcontract... [Thus,] Reyburn [must] be partially negligent to trigger the indemnity provision").

6.10    This leaves, at best, the only provision which could feasibly allow indemnification to be the vague subsection (e) which covers "any action by third parties." However, the rules of contract interpretation implore an interpretation of this provision which does not stretch to cover criminal actions by third-parties due to the consultant's admitted criminal behavior and lying to authorities.

> ii.    *The indemnification provision cannot satisfy the express negligence rule because it does not specifically evidence an intent to cover Fisher's intentional acts and lying to prosecutors.*

6.11    "Whether a contractual indemnity provision complies with the express negligence doctrine is a question of law for the court." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 459 (5th Cir. 2002).

6.12    Under the express negligence rule, "contracting parties seeking to indemnify one party from the consequences of its own negligence must express that intent in specific terms, within the four corners of the document." *Id.* at 458. This doctrine—at a minimum[18]—also applies to indemnification for a party's intentional torts. *Hamblin v.*

---

[18]    *See Hamblin v. Lamont*, 433 S.W.3d 51, 57 (Tex. App.—San Antonio 2013, pet. denied) ("we question whether public policy would prevent Lamont from prospectively contractually exculpating himself with respect to intentional torts even if the indemnity provisions contained the specific language."); *see also Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 924 (Tex. App.—Dallas 2013, no pet.) ("A number of appellate courts also have held that pre-injury waivers of gross negligence violate public policy and are void.").

*Lamont*, 433 S.W.3d 51, 57 (Tex. App.—San Antonio 2013, pet. denied). The Consulting Agreement does not satisfy this rule because it does not specifically express an intent to indemnify Fisher for his criminal misconduct.

6.13    Subsection (e) is insufficient to satisfy the express negligence rule because it does not state that Aztec will indemnify Fisher for any action by third-parties *due to the negligence of Fisher himself.* Courts will not simply imply an intent to indemnify a person for their own negligence because of broad language in the provision. *Quorum Health Res., L.L.C.*, 308 F.3d at 462 ("implicit agreements to require an indemnitor to indemnify against the indemnitee's own negligence are not express and, therefore, not enforceable."); *see also George L. Brown Ins.*, 237 P.3d at 97 ("contracts purporting to indemnify a party against its own negligence will only be enforced if they clearly express such an intent and **a general provision indemnifying the indemnitee 'against any and all claims,' standing alone, is not sufficient.**") (emphasis added). In fact, this sort of broad language is routinely found to be insufficient to provide an indemnitee protection from his own negligence. *See generally*, *Quorum Health Res., L.L.C.*, 308 F.3d at 462–63.

6.14    Further, if there is any question as to whether or not subsection (e) could cover the negligence of Fisher, it is clear the provision could not be stretched to cover Fisher's intentional and/or criminal misconduct. *See Hamblin*, 433 S.W.3d at 57 ("only an indemnity provision specifically stating an intent to indemnify the indemnitee for the indemnitee's intentional torts should be enforceable against the indemnitor for the indemnitee's intentional acts."); *Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 924 (Tex. App.—Dallas 2013, no pet.) (Holding that a valid express release from negligence would not be sufficient as an express release from gross negligence of the indemnitee).

6.15    Only one of the indemnification subsections even mentions willful misconduct and

that is provision (d), but that provision only applies "with respect to any decision *made by the Company*". This provision will not be able to cover Fisher's attorney's fees because no Aztec decision ever had any bearing on Fisher's personal decisions to: 1) participate in a stock manipulation scheme for his own profit, or 2) subsequently lie to authorities when said scheme was investigated.

6.16    Further, the willful language of subsection (d) cannot be imparted to subsection (e) as the Court cannot imply indemnification where it is not expressly stated. *Quorum Health Res., L.L.C.*, 308 F.3d at 463 ("Statements that require inference or extension to impose an indemnification obligation for the indemnitee's own negligence do not satisfy the express negligence doctrine.").

6.17    Since Fisher cannot point to any provision in the consulting contract which covers his criminal misconduct taken independent of any actions of Aztec, Fisher is not entitled to indemnification under the IFD contract as a matter of law.

> iii.    *Aztec cannot permissively indemnify Fisher's knowing violation of the law.*

6.18    If Fisher is not entitled to indemnification under the Consulting Agreement, then he could only attempt to seek permissive indemnification under Nevada law.[19] Fisher cannot satisfy the requirements of Nevada law for two reasons: one, Fisher did not follow the procedural requirements and two, Nevada law does not allow indemnification for Fisher's bad faith conduct.

6.19    First, Nevada law requires that any permissive indemnification be approved by

---

[19]    In Fisher's demand letter, Fisher only requested indemnification under the IFD Consulting Agreement. It is Movant's contention that only the IFD consulting contract applies because the initial stock manipulation scheme began while Fisher was not an officer and a corporation is allowed to contract for indemnification which is more limited than that allowed by statute. However, because Nevada law also allows for corporations to permissively indemnify officers, and a portion of the fees were incurred while Fisher was in fact an officer, this section is included out of an abundance of caution.

---

either the board of directors or shareholders *before* any payment is made. Nev. Rev. Stat. Ann. § 78.751. It is undisputed that Fisher never sought approval of the Board nor was the action approved by the shareholders.[20]

6.20   Second, Nevada law allows a corporation to permissively indemnify officers "with respect to any criminal action or proceeding, [only if the agent] had no reasonable cause to believe the conduct was unlawful." Nev. Rev. Stat. Ann. § 78.7502(1)(b). Bad faith and intentional misconduct can be found as a matter of law based on statements made under oath by a defendant as part of a plea agreement. *See e.g. Bansbach v. Zinn*, 801 N.E.2d 395 (N.Y. 2003) (Interpreting a statute with verbatim language to that of Nevada's and holding that officer's admission under oath that he made funds available to employees for the purpose of violating FEC laws meant that the officer could not be indemnified as a matter of law).[21]

6.21   Fisher not only pled guilty to obstruction of justice—and had such a plea entered as a final judgment—but signed under oath that he: "corruptly endeavored to influence, obstruct and impede the due administration of justice by providing false and misleading statements to agents of the [FBI] and prosecutors... knowing that the false and misleading statemenets were in connection with an on-going grand jury investigation... and intending the false and misleading statements to be conveyed to the grand jury." Exhibit 1, p. 19, ¶14.

6.22   It is impossible to come up with a situation in which Fisher—an attorney at the time—could have knowingly lied to prosecutors in good faith or in ignorance that it would

---

[20]   Even though Fisher owned a majority of the shares, he never held a meeting or acted under any type of written consent. This is likely because he knew that such a request would result in a lawsuit challenging his ability to be indemnified.

[21]   *Cohen v. Mirage Resorts, Inc.*, 62 P.3d 720, 727 (Nev. 2003) ("Because the Legislature relied upon the Model Act and the Model Act relies heavily on New York and Delaware case law, we look to the Model Act and the law of those states in interpreting the Nevada statutes.").

be a violation of the law. Further, Fisher's actions were fraudulent and intentional as he intended the prosecutors to rely on his misrepresentations to their detriment. As such, Fisher could not have been permissively indemnified by Aztec under Nevada law.[22]

**B.    *Fisher's unauthorized taking of corporate funds to pay for personal debts violated his duty of loyalty owed to Aztec.***

6.23    To prevail on a cause of action for breach of fiduciary duty, a plaintiff must show:

      1.    The existence of a fiduciary duty;

      2.    Breach of the duty; and

      3.    The breach proximately caused the damages.

*Klein v. Freedom Strategic Partners, LLC*, 595 F. Supp.2d 1152, 1162 (D. Nev. 2009).[23]

        i.    *Fisher owed fiduciary duties to Aztec by virtue of his position as an agent, director, and/or officer at all relevant times.*

6.24    The theft took place from January 15, 2010 through around March of 2013. Fisher owed fiduciary duties to Aztec at all relevant times because he was either a controlling person, an officer, or an agent of the corporation. Fisher was the CEO and Chairman of the Board of Aztec from June 15, 2007 through February 1, 2010 (when Fisher began his embezzlement). Exhibit 29. From February 1, 2010 through 2015, Fisher was an agent of the corporation via his consulting contract therewith. Exhibit 30, p. 1 – 3. Further, Fisher worked as a consultant for Aztec via IFD's Consulting Agreement with Aztec from 2004 through 2015 when it was terminated by the Board. Exhibit 2. Moreover, Fisher has

---

[22]    Further, from the language of the statute, it appears that even if Fisher's fees were allowed under the IFD Consulting Agreement they would still not be allowed beyond the extent of the permissive indemnification statute which also limits "any other… agreement… for either an action in the person's official capacity *or an action in another capacity while holding office…*" Nev. Rev. Stat. Ann. § 78.7502 (emphasis added). While the stock manipulation scheme took place before Fisher was an officer, his lying to authorities took place while he was.

[23]    Aztec Oil and Gas, Inc. is a Nevada corporation and the breach of fiduciary duty actions involve the internal affairs of the corporation and thus should be governed by the law of the state of incorporation. *See Hollis v. Hill*, 232 F.3d 460, 464 (5th Cir. 2000) ("Texas, like most other states, follows the internal affairs doctrine. That is, the internal affairs of the foreign corporation, including but not limited to the rights, powers, and duties of its board of directors and shareholders and matters relating to its shares, are governed by the laws of the jurisdiction of incorporation.").

purportedly controlled a majority of the shares and/or voting rights of the corporation through both his control of the preferred shares and his control over the common at the time he stole corporate funds.

6.25    Agents, officers and directors owe a duty of loyalty to their principal. *Nutraceutical Dev. Corp. v. Summers*, 373 P.3d 946, 2011 WL 2623749 at *4 (Nev. 2011) (Officers and directors' duty of loyalty); *New England Life Ins. Co. v. Lee*, 2015 WL 1413391, at *6 (D. Nev. Mar. 27, 2015) (Agents' duty of loyalty). Further, majority shareholders owe fiduciary duties to the corporation as well. *In re Amerco Derivative Litig.*, 252 P.3d 681, 700, n. 11 (Nev. 2011).

6.26    The duty of loyalty requires the fiduciary to act in good faith when dealing with the corporation and to not engage in self-dealing. *Nutraceutical*, 373 P.3d 946, at *4.

>           ii.    *Fisher breached his duty of loyalty owed to Aztec by using his positions and control to give himself corporate funds without approval and to which he was not entitled.*

6.27    It is a breach of the duty of loyalty for a fiduciary to use their position within a corporation to advance corporate funds to an entity which has no business relationship with the corporation or for a fiduciary to use corporate funds for their own personal benefit. *Foster v. Dingwall*, 227 P.3d 1042, 1051 (Nev. 2010).

6.28    Fisher breached his duty of loyalty by using his positions of power and trust to send Aztec's corporate funds to an entity which was not entitled to such funds (Steptoe & Johnson) and for the purpose of covering his own personal debt. Fisher's decision to trick Aztec into paying his attorney's fees was done in secret and in bad faith, and was done solely for his own personal benefit as Aztec had no liability, obligation, or even the legal authority to pay Fisher's independent legal fees arising out of his criminal misconduct. Fisher's bad faith is evidenced by his lying to Director Lehrer and refusal to use proper channels to

approve payment of his attorney's fees despite purportedly controlling 80% of Aztec's voting power.

6.29    The corporation was damaged because of Fisher's breach of his fiduciary duty when it paid out funds to Fisher, to which Fisher was not legally entitled. Exhibit 6, p. 3 – 7.

6.30    Aztec is thus entitled to partial summary judgment on its cause of action for breach of fiduciary duties because of Fisher's taking of nearly a million dollars in corporate funds, to which he was not entitled, amounted to self-dealing in violation of his duty of loyalty owed to Aztec.

### C.    Fisher's taking of corporate funds to pay for his attorney's fees was perpetrated by misrepresentation and fraud.

6.31    The actions that Fisher took in furtherance of stealing Aztec's funds in order to pay for his attorney's fees amounted to fraud through both affirmative misrepresentations and by failure to disclose material facts.

> *i.    Fisher made fraudulent misrepresentations in order to receive the corporate funds to pay his attorney's fees.*

6.32    To prevail on a cause of action for fraud by misrepresentation, a plaintiff must show:

1. The defendant made a false representation to plaintiff;
2. The representation was material;
3. When the defendant made the representation, the defendant:
   a. Knew the representation was false; or
   b. Made the representation recklessly;
4. The defendant made the representation with the intent that plaintiff act upon it;
5. The plaintiff relied upon the representation; and
6. The representation caused the plaintiff injury.

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011).

a.   *Fisher made a false representation to Aztec by sending invoices to it's accountant saying that amounts were due when they were not.*

6.33   A representation can be made either directly or indirectly. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 579 (Tex. 2001). A defendant commits fraud indirectly when it makes a false representation to a third party with the expectation that it be relied upon by the plaintiff. *Id.* at 579–80.

6.34   Fisher sent invoices to Aztec's outside accountant. Exhibits 5, p. 2; and 6, p. 4 – 7. Fisher represented that these invoices evidenced amounts due *by Aztec* which needed to be paid. *See e.g.* Exhibit 5, p. 2 (Handwriting and signature of Fisher on invoice sent to accountant saying to pay the invoice). Fisher sent these invoices to the accountant with the expectation that Aztec would rely upon them — i.e. pay the invoices. Thus, this indirect representation to Aztec is actionable.

6.35   This representation was false because the fees had not been approved and thus they were not yet due. *See* Nev. Rev. Stat. Ann. § 78.751 (Requiring any discretionary indemnification of officers or directors to be authorized by either the stockholders or the board). Further, Fisher did not make any demand upon anyone in Aztec before paying his first invoice and afterwards, only made a demand upon his subordinate Waylan Johnson. Moreover, these representations were false as Fisher was not legally allowed to be indemnified for his bad faith conduct nor was his indemnification covered under any of his consulting agreements. The attorney's fees owed to Steptoe & Johnson were in reality a personal debt of Fisher's which Aztec had no obligation to pay.

6.36   Further, Fisher represented that Aztec authorized payment of the sum of money on the checks by signing them, even though he knew Aztec had not in fact done so.

6.37   Additionally, Fisher represented to Cox that the invoices from Steptoe & Johnson

were in fact a bill of Aztec and not his own personal debt in order to induce her to sign the other checks.

6.38    Moreover, Fisher directly represented to Director Lehrer that he was paying his own attorney's fees in the Department of Justice investigation. Exhibit 7, ¶¶ 10 – 14. This representation was false, as in fact, Aztec had already paid over $700,000 of Fisher's legal bills at the time it was made.

### b.    Fisher's misrepresentations were material.

6.39    A representation is material "if a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd.*, 341 S.W.3d at 338.

6.40    Aztec would not have paid the invoices had they known they were for attorney's fees which were not in fact due and owing. *See* Exhibits 7 (Director Lehrer), ¶¶ 15 – 18; and 8 (Director Vance), ¶¶ 6 – 9. Thus, Fisher's representations were material in Aztec's decision to write the checks.

### c.    As an attorney and CEO, Fisher's representations that there were amounts due and owing were either knowing falsehoods or made with reckless disregard for the truth.

6.41    Knowledge requires actual awareness as to the falsity of a statement. *All Am. Siding & Windows, Inc. v. Bank of Am., Nat. Ass'n*, 367 S.W.3d 490, 504 (Tex. App.—Texarkana 2012, pet. denied). A defendant "acts recklessly if he makes representations without any knowledge of the truth and as a positive assertion." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 527 (Tex. 1998).

6.42    The following facts show that Fisher either knew that the invoices were not actually due at the time he sent them to the accountant or that he sent the invoices as a positive assertion they were due and owing by Aztec, without any knowledge as to the truth of such

an assertion:

- Fisher was an attorney, CEO, and Chairman of the Board at the time he began his embezzlement and thus knew or should have known the laws surrounding corporate governance; Exhibit 29.
- Fisher wrote the indemnification provision in the Consulting Agreement himself;
- Fisher was told to seek out his own separate attorney by Porter Hedges because of the nature of the charges against him and the conflict of interest between the two;
- Fisher personally sent invoice 2326302 for $124,456.75 to the outside accountant with a signed note which read: "Pay under indemnification clause in IFD consulting contract w/ Aztec"; Exhibit 5, p. 1 − 2
- On January 25, 2010—ten days after Aztec had paid for his first invoice—Fisher purportedly demanded indemnification for the first time from Waylan Johnson, his subordinate at Aztec; Exhibit 4
- Fisher was Chairman of the Board until February of 2010 yet never brought payment of his attorney's fees to the Board's attention; Exhibits 7 (Director Lehrer), ¶ 16; and 8 (Director Vance), ¶ 7
- Fisher continued to work with Aztec as a consultant up until 2015 and never brought the issue of attorney's fees to Aztec's attention; Exhibits 7 (Director Lehrer), ¶ 16; and 8 (Director Vance), ¶ 7
- Fisher knew that he had not made any demand upon the Board;
- Fisher knew that Waylan Johnson had not responded to the demand for fees made upon him and that Waylan Johnson was not the proper person to serve any demand on;
- Fisher never asked Aztec its opinion as to the legality of payment of the attorney's fees given the nature of the crime he was pleading guilty to and the fact that he was a director at the time he committed the crime; Exhibits 7 (Director Lehrer), ¶ 16; and 8 (Director Vance), ¶ 7; and 9 (Waylan Johnson), ¶¶ 7 − 10
- Fisher affirmatively told board members that Aztec would not be paying his attorney's fees; Exhibit 7 (Director Lehrer), ¶¶ 10 − 14
- Despite all of this, Fisher continued to personally approve and send invoices to the outside accountant to pay for his attorney's fees and then to sign checks for payment to Steptoe & Johnson; Exhibits 6, p. 6 − 7; and 9 (Waylan Johnson), ¶¶ 13 − 16
- Fisher paid for these fees secretly and the Board—aside from Fisher—had no knowledge of the payment; Exhibits 7 (Director

Lehrer), ¶¶ 15 − 18; and 8 (Director Vance), ¶¶ 6 − 9
and

- Fisher decided to secretly pay his attorney's fees despite the fact that he purportedly held over 80% of Aztec's voting power.

6.43   Thus, at a minimum, Fisher acted recklessly because as an attorney and CEO, he knew or should have known that directors were not always allowed to be indemnified for their criminal acts. Further, Fisher knew or should have known that there was a high possibility his criminal acts of lying to prosecutors and stock manipulation—which were taken entirely independent of Aztec—would not be covered by the indemnification provision. Despite this, Fisher chose to make the positive assertion that he was entitled to reimbursement and that the amount was automatically due and owing. Fisher then sent this positive assertion to the outside accountant without any knowledge as to whether or not he was truly entitled to indemnification.

> d.     *Fisher intended Aztec to rely on his misrepresentations and to pay the invoices for his attorney's fees.*

6.44   Despite knowledge to the contrary, Fisher personally wrote and signed on invoice 2326302 that Aztec owed Steptoe & Johnson money under the IFD Consulting Agreement and told the accountant to write a check for payment to Steptoe & Johnson. Exhibit 5, p. 1 − 2. Fisher expected the accountant to rely on that invoice as well as all others he subsequently sent and expected the accountant to write a check for payment of such expenses. Fisher, and/or Cox at the request of Fisher, then signed the checks for payment. Exhibit 9, ¶¶ 13 − 16.

> e.     *Aztec relied upon Fisher's misrepresentations and suffered damages when it paid the invoices.*

6.45   Aztec was damaged because it paid out corporate funds to Fisher which he was not legally entitled to. Exhibit 6, p. 3 − 7.

6.46    The Board never knew that it had paid Fisher's Steptoe & Johnson attorney's fees and would not have approved such an expenditure had it been brought to their attention. Exhibits 7 (Director Lehrer), ¶¶ 15 – 18; and 8 (Director Vance), ¶¶ 6 – 9. When the Board discovered Fisher's embezzlement, they brought this lawsuit to recover Aztec's funds. Exhibit 10, p. 4 – 5.

> ii.    *Fisher fraudulently failed to disclose information when sending attorney's fees invoices to the outside accountant for payment.*

6.47    To prevail on a cause of action for fraud by nondisclosure, a plaintiff must show:

> 1. The defendant had a duty to disclose material facts to the plaintiff
> 2. The defendant failed to do so;
> 3. The defendant knew the plaintiff was ignorant of the facts, and did not have an equal opportunity to discover the truth;
> 4. The defendant concealed the material facts with the intent that plaintiff act upon it;
> 5. The plaintiff relied upon the representation/failure to disclose;
> 6. The representation/failure to disclose caused the plaintiff injury.

*Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997) ("when circumstances impose upon a party a duty to speak and the party remains silent, the silence itself can be a false representation.").

> a.    *Fisher owed a duty as an agent, director, and/or officer to disclose material facts to Aztec and because of his misleading partial disclosures.*

6.48    A duty to disclose material facts arises as the result of a fiduciary relationship. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998).

6.49    Fisher owed a duty to disclose material facts to Aztec at all relevant times because he was either a controlling person, an officer, or an agent of the corporation. *See Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007). Fisher was the CEO and Chairman of the Board of Aztec from June 15, 2007 through February 1, 2010 (when

Fisher began his embezzlement). Exhibit 29. From February 1, 2010 through 2015, Fisher was an agent of the corporation via his consulting contract therewith. Exhibit 30, p. 1 – 3. Further, Fisher worked as a consultant for Aztec via IFD's Consulting Agreement with Aztec from 2004 through 2015 when it was terminated by the Board. Exhibit 2.

6.50    Further, Fisher owed a duty to disclose because his partial disclosure (the invoice) was misleading under the circumstances and thus Fisher had a duty to disclose the whole truth (that the invoice had not been approved by anyone at Aztec and was a personal debt). *See Anderson, Greenwood & Co. v. Martin*, 44 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("[Aside from a fiduciary relationship, a] duty to speak may arise in at least three other situations: First, when one voluntarily discloses information, he has a duty to disclose the whole truth. Second, when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue. Finally, when one makes a partial disclosure and conveys a false impression, he has a duty to speak.").

> b.    *When submitting invoices for payment, Fisher failed to disclose the material fact that the invoices were not in fact due or owed.*

6.51    Fisher sent invoices to Aztec's accountant which showed amounts due and owing. Fisher failed to inform the accountant upon sending the first invoice, that he had not made a demand for payment upon anyone in Aztec. After the first invoice, Fisher failed to disclose that the amounts were not currently due by Aztec because they had not been approved by the Board and were outside the scope of the Consulting Agreement.

6.52    Moreover, Fisher failed to disclose the amounts were not actually due by Aztec but instead, were his own personal debts and/or the debts of his company, IFD. These amounts were not due because Aztec was not legally allowed to indemnify Fisher for his bad faith

acts and his conduct which was outside the scope of his Consulting Agreement. Failure to include such facts was material, as the accountant would not have written checks for a bill not actually due by Aztec.

6.53    Fisher had communications with the directors pertaining to the issue of attorney's fees both while he was taking corporate funds for his personal benefit and afterwards. Exhibit 7, ¶¶ 10 – 14. Fisher either directly lied to the directors during these meetings about whether or not he was paying his attorney's fees or failed to disclose the material fact that he was.

> c.     *Fisher knew that Aztec's accountant was ignorant of such facts and omitted such facts before submitting them to the accountant.*

6.54    Fisher knew or should have known the outside accountant had no knowledge the attorney's fees invoices were not actually due and owing by Aztec and knew or should have known the outside accountant would pay an invoice signed by the CEO.

6.55    Fisher knew or should have known that the Board had no knowledge of any sort that Fisher's legal fees were paid for by Aztec, because he did not tell them and they were not involved in the day-to-day operations of Aztec. Exhibits 7 (Director Lehrer), ¶¶ 7, 15 – 18; 8 (Director Vance), ¶¶ 4 – 9; and 9 (Waylan Johnson), ¶¶ 3 – 6. The only other employee at the Houston office who could have seen the fraud, Cox, was lied to by Fisher when he told her that there was an amount due *by Aztec*. Further, Fisher knew that the Board was under a false impression that Fisher would not be indemnified because he personally told Director Lehrer that he was paying his own attorney's fees. Exhibit 7 (Director Lehrer), ¶¶ 10 – 14.

6.56    Fisher knew or should have known that Aztec would not have an opportunity to discover the fraud before paying the checks. Fisher personally sent the invoices from the Houston office to an outside accountant who billed Aztec and then sent out checks to

Steptoe & Johnson signed by either Fisher, or Cox at the direction of Fisher. Aztec was only able to discover the embezzlement after Fisher had already paid out the funds. As soon as Aztec discovered the fraud, they brought this suit for return of the funds. Exhibit 10.

> d.    *Fisher intended Aztec to rely on his failure to disclose.*

6.57    Fisher personally wrote and signed on invoice 2326302 that Aztec owed Steptoe & Johnson under the IFD Consulting Agreement and told the accountant to write a check for payment. Exhibit 5, $1 - 2$. Fisher expected the accountant to rely on the invoice and to write a check for payment of such expenses.

> e.    *Aztec changed its position based on Fisher's failure to disclose when Aztec paid Fisher's attorney's fees.*

6.58    The corporation was damaged because it paid out funds to Fisher to which Fisher was not legally entitled. Exhibit 6, p. $4 - 7$.

6.59    The Board never knew that Aztec had paid Fisher's attorney's fees and would not have approved such an expenditure had it been brought to their attention. Exhibits 7 (Director Lehrer), ¶¶ $15 - 18$; and 8 (Director Vance), ¶¶ $6 - 9$. When the Board discovered Fisher's embezzlement, they brought this lawsuit to recover such damages. Exhibit 10, p. $4 - 5$.

4.60    Aztec is thus entitled to partial summary judgment on its cause of action for fraud because Fisher embezzled nearly a million dollars to pay off a personal debt by using misrepresentations and by failing to disclose material facts.

## 7. CONCLUSION

7.1    Aztec is entitled to have its motion for partial summary judgment granted, with the Court holding that Fisher is not entitled to indemnification of his knowingly criminal conduct. Neither the Consulting Agreement, nor Aztec, ever contemplated that Aztec would

indemnify Fisher for criminal and intentional misconduct taken outside the scope of the agreement. Further, such indemnification is not allowed by statute under Nevada law.

7.2     Further, the Court should dismiss with prejudice Fisher's counter-claim for further payment of the Steptoe & Johnson attorney's fees and command Fisher to reimburse Aztec for the Steptoe & Johnson fees he has already taken. Fisher is not entitled to indemnification for any of the Steptoe & Johnson attorney's fees as a matter or law because they were incurred independent of any actions of Aztec and due solely to the criminal misconduct of Fisher. Further, unlike the Porter Hedges fees, Steptoe & Johnson has never purported to do *any* legal work for Aztec.

7.3     Fisher's criminal misconduct is not covered by the Consulting Agreement and is not allowed to be permissively indemnified by statute and thus, Fisher's directing of Aztec to pay off his personal debt was self-dealing, theft, and fraud.

## 8. RELIEF REQUESTED

WHEREFORE, Aztec prays that the Court grant its Partial Motion for Summary Judgment and hold:

a.     Fisher has no right to contractual indemnification from Aztec under the Consulting Agreement;

b.     Fisher has no right to statutory indemnification under Nevada law;

c.     Fisher's counter-claim for indemnification for attorney's fees and damages incurred by him in connection with the Department of Justice investigation is dismissed with prejudice;

d.     Fisher's embezzlement of Aztec's corporate funds to pay for his attorney's fees was in violation of his fiduciary duties owed to Aztec;

e.     Fisher's embezzlement of Aztec's corporate funds to pay for his attorney's fees was done fraudulently;

f.     At this time, Aztec is entitled to judgment in the amount of: $703,388.11 and interest thereon, which represents the amount Aztec paid out of

pocket to Steptoe & Johnson for Fisher's legal fees.

g.     Upon proper proof, Aztec may still seek damages if it wishes to for: 1) punitive damages for the fraud discussed in this motion; 2) attorney's fees Aztec is entitled to under the Consulting Agreement as a prevailing party to a related action; 3) the attorney's fees paid to Porter Hedges by Aztec because of the conduct of Fisher; and 4) all damages still otherwise sought in Plaintiffs' Original Complaint.

and grant any other relief Aztec may be entitled at law or under theories of equity.

Respectfully submitted,

CHRISTIAN, SMITH & JEWELL, L.L.P.

By:  _/s/ Gary M. Jewell_
      GARY M. JEWELL
      Texas Bar No. 10664800
      *gjewell@csj-law.com*
      2302 Fannin, Ste. 500
      Houston, Texas 77002
      Telephone: (713) 659-7617
      Facsimile: (713) 659-7641

**ATTORNEY FOR PLAINTIFFS
AZTEC OIL & GAS, INC. and
AZTEC ENERGY, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on this the 7th day of October, 2016 that a true and correct copy of the foregoing was served via electronic mail to all parties requesting ECF Notice.

By:  _/s/ Gary M. Jewell_
      GARY M. JEWELL